### COOKE v. SMITH and others.

A merchant who was sued for his debts and was insolvent, sold his entire stock in trade to his confidential clerk, on a credit of from three to eighteen months. It was a part of the arrangement that the clerk should continue the business with the merchant's sister, who was to be allowed to draw out of the concern, an annual sum, and was to pay the same to the merchant, for his assistance in the business. *Held*, that the sale was fraudulent and void as against creditors.(a)

The vendor assigned the notes which he received on the fraudulent sale, to an assignee for the benefit of himself and other preferred creditors of the assignor. *Held*, that the assignee was not such a *bona fide* purchaser as to be protected in the notes or their proceeds.

*Held also*, that the acceptance of such an assignment, was not an affirmance of the

---

(a) See *Vance* v. *Phillips*, 6 Hill, 433.

fraudulent sale on the part of creditors, so as to prevent other creditors from im-. peaching it for fraud.

A creditor at the time of a fraudulent sale, who subsequently recovers a judgment, may on the return of his execution unsatisfied, file a bill to set aside the sale ; and may follow the proceeds of the property sold, into the hands of any number of intermediate assignees, and it is not beyond his reach, until it lodges in the hands of a creditor in good faith, who has received and applied it upon his debt, or of a *bona fide* purchaser without notice of the fraud.

December 15, 17, 1845 ; March 13, 1846.

THE bill was filed August 16, 1844, by Zenas Cooke, against Silas C. Smith, John Gray, Jane Smith, John H. Browning and Jesse W. Benedict, on the following case. S. C. Smith, a merchant in New York, in the fall of 1843, became greatly embarrassed, and was sued by his creditors. His debts were about $30,000, and his assets realized not beyond a third of that amount. On the first of January, 1844, he made a sale of all of his stock in trade to Gray, who for many years had been his confidential clerk, and who was worth about $1000, although only $200, or $300, of it, was available. The amount of the sale was $7000, for which Gray gave his notes payable monthly, and running from three to eighteen months, after date. Gray then continued the business with Jane Smith, a sister of S. C. Smith, in the name of Smith & Gray. This sale, the complainant insisted was fraudulent as to creditors. The facts in regard to it will be found more at large in the opinion of the court. Gray's notes were not actually given till February 7, 1844, and on the 9th day of February, S. C. Smith assigned the notes to Browning in trust, to collect the same and pay certain preferred creditors, of whom the assignee was one. On the 13th of March following, a creditor of S. C. Smith's having levied on the goods in the store, Gray, and Jane Smith executed an assignment to Benedict, for the benefit of their creditors, and among others, to pay the notes given by Gray to S. C. Smith. The goods assigned, were. in part those sold by S. C. Smith, and in part goods subsequently purchased by the assignors. Benedict proceeded to sell the goods, and in April, 1844, closed the whole by a sale at auction.

The complainant recovered a judgment against S. C. Smith, February 12, 1844, and issued his execution in March, which was returned unsatisfied in due course, and he then filed his bill

Cooke v. Smith.

to set aside the sale &c., as fraudulent. It appeared that Jane Smith had $300, which she gave to Gray, to put into the concern, and which by the books appeared to have been returned to her or S. C. Smith, before the assignment of Smith and Gray ; as was the case with Gray's advances also.

All the defendants answered the bill, and the cause was heard on the pleadings and proofs.

*F. Sayre,* for the complainant.

*H. Brewster,* for Gray and S. C. Smith.

*J. Wyman Jones,* for Jane Smith.

*C. O'Conor,* for Browning and Benedict,—after illustrating the point urged by all the defendants, that the sale by S. C. Smith to Gray, was not fraudulent as against creditors ; and contending that the subsequent assignment, by S. C. Smith to Browning, and by J. Smith and Gray to Benedict, were free from all fraudulent design or purpose ; argued two other propositions in behalf of the assignees.

1. If there was any defect in the title of Gray, acquired by his transactions with S. C. Smith, it was only defective as against creditors. The first creditor who acquired the power, obtained the right of exercising this election to affirm or disaffirm the sale; and Browning himself, and as representative of the other creditors of Smith, provided for in the assignment, had the power to elect, and did elect to affirm the sale and notes, before the plaintiff acquired any lien upon the goods assigned to Gray. (*Parmelee* v. *Egan,* 7 Paige, 611.)

2. The complainant having acquiesced in the transfer to Gray, and without a murmur suffered the latter to go on with the business, contract new debts, mingle with the Smith goods those acquired by such new debts, it would be unjust and inequitable to permit the complainant now to impeach the transaction. (*Poole* v. *Mitchell,* 1 Hill's S. C. Law. Rep. 404.)

THE ASSISTANT VICE–CHANCELLOR—This is a close case on the question of fraud in the sale from S. C. Smith to Gray, but

after carefully considering the facts, I cannot resist the conclusion that the sale was made with the intent to hinder and delay the creditors of Smith, and that Gray was aware of the objects which Smith had in view.

Smith was deeply insolvent, and in consequence of the pending suits against him, it was impossible for him to continue business much longer in his own name. Gray was his confidential clerk, and knew his situation. Although Gray was a man of good character, his means were small, and totally insufficient to warrant the sale to him of so large a stock of goods upon credit. No merchant in regular business, would have sold such an amount to him without security, on the credit that was given by Smith.

It was unquestionably a part of the agreement between Smith and Gray, that Jane Smith should be introduced as a nominal partner with Gray, and that S. C. Smith should be employed by the new firm, and receive a compensation for his services. Gray's entries in the books, are conclusive that the arrangement that Jane should be his partner, was cotemporary with the sale to him; and the employment of S. C. Smith, must then have been understood between them. Gray's entry in the day book, shows that he was to share equally with her in the gain or loss, and each was to be at liberty to draw out $600 a year. This was the precise sum which S. C. Smith, was to receive and he was to receive it from Jane's share, and in lieu of her drawing it out of the concern; and it is not probable that Gray would agree to give all his services, without some equivalent from her.

Smith says he was employed on one of the first days in January, as of the first of January, which was the day from which the sale and the partnership both dated.

Gray never had any conversation with his partner about the formation of the firm, or its conduct after it went into operation. S. C. Smith managed it all; and her situation, circumstances and pursuits, show that the use of her name was all that was wanted, and that her interest in the concern was nominal. The defendants say that her name was obtained to keep up the good will of the store, which was in some measure dependent upon

the name of Smith. This may have been the inducement held out to Gray, but it is plain that S.. C. Smith used her name to secure a control in the concern, and a means of subsistence for himself.

I cannot doubt from the situation of Gray and Jane Smith, in respect of S. C. Smith, and their respective relations, that S. C Smith arranged and managed the whole affair of the sale and the partnership in his own way, and to subserve his own purposes. His plan was, to place the goods on hand, in such a position, that they would form the basis and capital for continuing the business of the store without interruption ; and enable him through the use of his sister's name, to enjoy half the gains and profits, and at all events to secure $600 a year towards his support.

The notes were not given till five or six weeks after the sale, nor until they were wanted for Smith's assignment to Browning.

The effect of the transaction was necessarily to hinder and delay the creditors, because instead of a levy on the goods and a sale for cash, the creditors were turned over to a series of notes running from three to eighteen months, against a man of slender pecuniary responsibility. This being the effect, and such effect being intended by Smith, and its object being to derive a future benefit from the transaction to himself, it was in my judgment, fraudulent against his creditors.

This result invalidates Gray's title to the goods, and his voluntary assignee can have no better title than he had, either in the goods which remained on hand, or their proceeds.

I do not think the question is affected by the intermediate assignment of the notes by S. C. Smith to Browning. It is not necessary to dispute the proposition, that if Browning had received the notes in payment of his debt, without notice of the fraud, he would have been entitled to enforce them against Gray, and to claim the benefit of Gray's assignment of the goods to secure their payment. But that is not this case. Mr. Browning is an assignee, in trust for paying preferred creditors, himself among the number, *out of the proceeds of these notes.* If Gray had failed, and his notes become worthless, Browning's debt against Smith would remain in as full force as if the assignment

to him had never been executed. There was neither purchase or payment in the transaction.

I do not think that the principle decided in *Parmelee* v. *Egan,* (7 Paige, 610,) is applicable. The facts in that case seem to be defectively stated by the reporter; but the point decided was, that a judgment creditor who had not issued an execution, was not in a condition to attack a fraudulent sale of goods liable to execution. Parmelee, who had issued an execution, while the goods were still in the hands of the fraudulent purchaser, was held entitled to be paid, in preference to the *bona fide* assignee for the benefit of other creditors. It was not decided in that case, that if the other judgment creditors had issued executions and had them returned unsatisfied before the filing of the bill, they would not have been entitled to the same preference as Parmelee received.

I think it should be so on principle; and that a creditor, who by his judgment in respect of real estate, his execution issued as to movables, and his execution returned as to things in action, is entitled to file a bill to set aside a fraudulent conveyance, sale or assignment; may follow the proceeds of the property transferred, into the hands of any number of intermediate assignees, and until the property or its proceeds, lodge in the hands of a *bona fide* creditor who has received and applied it upon his debt, or of a *bona fide* purchaser without notice of the fraud.

The complainant is not proved to have acquiesced in the sale to Gray, in any such manner as to preclude him from impeaching it on the ground of fraud.

As to the assignment to Mr. Benedict, the avoidance of the sale of the goods by S. C. Smith, does not render it fraudulent. Its effect is to withdraw from the assignee, so much of the assets as came from that sale, either directly or indirectly. He is entitled to be protected in the payments made by him before the bill was filed, and to receive his costs out of the fund.

As to Mr. Browning, if the unapplied fund in his hands, arose from the goods in question, it is liable to the complainant's demand, so far it is requisite to discharge the latter.

The complainant is entitled to a decree accordingly, for his debt, interest and costs.